## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DAVIS BUICK GMC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-1151 |
| | ) | |
| SCOTT A. RIDDLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendant Riddle's Motion (Doc. 131) for Summary Judgment, Plaintiff Davis' Response (Doc. 141) and Defendant Riddle's Reply (Doc. 148). For the reasons set forth below, Defendant's Motion is DENIED.

### BACKGROUND[1]

This relatively straight-forward dispute over a 6-page contract has produced multiple motions to dismiss, three summary judgment motions, and a motion to strike. While the legal issues in this case are not complicated, the facts are numerous and many are in dispute.

Davis enrolled in the General Motors Facility Image Program ("GMFI Program") in 2011 for the renovation of his Buick/GMC dealership facility in Canton, IL prior to engaging the Defendant, Riddle, to be its GMFI consultant. GM, through Gensler, its in-house architectural firm, drafted and issued the Facility Image DID ("Design Intent Document"), version 6.0, to Davis in both electronic format and in a printed binder format containing approximately 170 pages of GM Essential Brand Elements ("EBE") Program requirements. Davis was in possession

---

[1] The following facts are derived from Defendant's Motion for Summary Judgment (Doc. 131), Plaintiff's Response (Doc. 141), and Defendant's Reply (Doc. 148). The statements contained herein are agreed to by the parties as undisputed unless otherwise noted.

of those requirements from the beginning of the GMFI project. By enrolling in the GMFI program, Davis understood that the DID set out all the requirements for the design and build-out of Davis' GMFI renovation project. Davis reviewed the contents of the DID with his GM Zone Manager, Jim Jarvis, his architect, Russell Arbuckle of EA Architects, and Scott Riddle. The requirements included the type of Aluminum Composite Material ("ACM") to be used, the showroom electrical fixtures to be installed, the painting format for the service lane/shop area, and the clear glass requirements for the showroom glazing. Doc. 131 at 5.

Under the terms of the DID, Davis was required to navigate through various timeline "gates" before GM would disburse periodic funding to cover part of the renovation costs. After enrolling in the GMFI program, Jarvis introduced Davis to Riddle for the purpose of assisting Davis in navigating the GMFI program requirements as set out in the DID. The DID required Davis to comply with the design and materials specifications as mandated therein and obtain Gensler's final compliance verification. One of Davis' goals was to keep costs as low as possible. Davis hired Riddle on June 8, 2011, pursuant to the parties' Agreement.[2] The parties' Agreement set forth all of the duties that Davis and Riddle had to each other. In 2014, the parties stipulated to a change to the monthly payment schedule from $2,000.00/month to $1,000.00/month, with the outstanding balance due on final Gensler approval. *Id*. at 6.

Davis hired Edwards Architects ("EA") on May 21, 2012 as its licensed architectural designer.[3] Davis' contract with EA required EA to deliver construction drawings ("CDs") and specifications in compliance with the GMFI standards, and specifically, to gain design intent

---

[2] The parties disagree on the title of Riddle's position. Riddle insists he was hired as a consultant. Plaintiff, referencing the title of the agreement, insists Riddle was a project manager and Davis' representative. Doc. 131 at 6, Doc. 141 at 10.
[3] Davis objects to the portion of this statement of fact which added that EA was the "specifier of the materials to be used…" Doc. 141 at 23. Davis is correct that the contract did not include that language and thus the Court considers only the above-stated portion of this statement as undisputed.

approvals from GM and the client and to deliver design intent submittal documents for review and approval by the client and the franchise architect.[4] EA produced the required CDs, which were then submitted to and approved by Gensler on October 3, 2012. The CDs specified the correct Aluminum Composite Material ("ACM"), the correct showroom and service lane light fixtures, and the correct three-color painting format, as specified in the DID. The DID mandated clear glass. Prior to enrolling in the GMFI program, Davis had darkening film on its glass. *Id*. at 6–7.

Following Gensler's approval of the CDs, Riddle contacted John Kunski, the building inspector in Canton, IL, to arrange a "conditional" building permit for Davis, as Davis' DID start of construction timeline gate was looming. Obtaining said permit was one of two minimum requirements needed for Davis to pass through the GMFI start of construction "gate." Davis had to present a building permit and a purchase order (P.O.) for a long lead-time item such as ACM to GM Zone Manager Jim Jarvis. Riddle got the conditional permit.[5] Riddle emailed the conditional building permit and the P.O. for the correct rainscreen ACM system to Jarvis on November 7, 2012 so Davis could stay "green" and copied Davis on that email.[6] Pursuant to the Davis/Riddle Agreement, Riddle convened a pre-construction meeting in Canton, Illinois on April 17, 2013, with Davis, Riddle, EA, and Catalyst present. At that meeting, Catalyst presented the materials and labor bids to Davis and the list of subcontractors it intended to use. Riddle

---

[4] Riddle purports to quote from the agreement but the agreement does not contain the quoted language verbatim. Instead, counsel merged two separate portions of the agreement. Counsel, who has repeatedly expressed concern over the amount and cost of litigating this matter, brings those issues upon himself by creating unnecessary issues about what that agreement said. If counsel wishes to paraphrase he is free to do so. If he wishes to employ quotes, the quoted language should comport with the actual text of the Agreement.

[5] Davis states in his Response that this fact is disputed "to the extent that Riddle is alleging that was the only purpose of this email—others took the statements stated in that e-mail as direction." Doc. 141 at 11. But Defendant's statement of fact does not mention an email, or its purpose. The statement is therefore undisputed.

[6] Davis lists this statement as disputed but does not identify any dispute. Doc. 141 at 11. The statement is therefore undisputed.

informed all parties present that Gensler had been approving an extruded ACM product at other GMFI projects and it was less costly. Several dealers had received final approval from Gensler. *Id*. at 7–8.

Davis formally hired Catalyst on June 4, 2013 per the terms of the Davis/Catalyst contract. Davis wanted to keep costs low but disputes that cost savings was his only consideration. Doc. 141 at 24. On April 23, 2013, one week after the pre-construction meeting, EA changed the Gensler-approved CDs of October 3, 2012, which included changes to the showroom and service lane lighting. EA did not resubmit those changed CDs to Gensler for approval or compliance with the DID. Arbuckle (EA) testified that T-5 fluorescents would never meet the DID requirements. Davis stated that he knew that EA had made changes to the CDs without getting Gensler approval. The parties dispute whether this was at Riddle's direction. Doc. 141 at 11–12. All non-compliant changes to the CDs required resubmission for approval by Gensler. The unapproved CDs of April 23, 2013 were thereafter turned over to Catalyst to use in the construction of the Davis project. The Davis/Catalyst contract provided that Catalyst would build out the Davis GMFI project in accordance with the work described in the CDs, where the unapproved plans of April 23, 2013 were used, not the approved plans.[7] The parties dispute whether Riddle was furnished with the revised CDs and whether he knew that EA had changed the Gensler-approved plans, as well as whether EA ever contacted Riddle concerning the changes. Doc. 131 at 8–9; Doc. 141 at 12.

Included in the changes to the CDs were the elimination of the NVD addition, the elimination of the full-height service lane separation wall, the substitution of 2' x 4' lay-in

---

[7] Davis lists this statement as disputed because he would "dispute any characterization of the plain language of the agreement." Doc. 141, at 25. If Davis believed the contract should be characterized differently, this was his place to do it. He hasn't. The statement is therefore undisputed.

fluorescent lighting fixtures in the showroom, and the retention of the existing fluorescent lighting in the service lane. EA did not specify painting of the brick knee wall under the showroom glazing white in lieu of cladding it with ACM, nor did it show the retention of the bronze colored showroom glazing mullions instead of the DID-required anodized aluminum mullions, as shown on the Gensler-approved CDs of October 3, 2012. Prior to the pre-construction meeting on April 17, 2013, Riddle had been in contact with Jarvis to discuss the changes. According to Riddle, Jarvis indicated to Riddle that those requests would be allowed as exceptions from the DID requirements once Davis got to the point of requesting final verification. According to Davis, Jarvis had only said he was "in support of" the exceptions as discussed by Riddle, and no exceptions had in-fact been granted prior to the First Verification Record. Doc. 141, at 26.

The parties also dispute what occurred at the pre-construction meeting. According to Riddle,

> Riddle informed the assembled group at the pre-construction meeting that Jarvis had given his preliminary OK for the exceptions. At no time during the pre-construction meeting or thereafter was there any discussion between Riddle and EA for a change to fluorescents in the showroom unless augmented or to change service lane lighting. (Exh. 40, pp. 50, 75; Exh. 43, p. 95).

Doc. 131 at 9, ¶28. The Court has reviewed the citations Riddle included in this statement of fact, but they do not appear to support the factual statement being offered. In fact, counsel relies on the first part of Davis' statement—that he did not have a specific recollection of Riddle's verbal design directive regarding lighting—but ignores the second half of the statement—that it was Davis' understanding that "yes, the process did happen." Doc. 131-43 at 6. Furthermore, Davis correctly disputes this fact, responding that Riddle had already given the direction on the lighting in the showroom at the time, and Zingre and Riddle would have discussed the lighting

changes after this point. Doc. 141 at 26. The deposition testimony of Kim Zingre of EA, cited by

Davis, is particularly relevant to the Court's analysis and is thus reproduced here:

> Q. Did you unilaterally make the decision to change to a T-5 fluorescent fixtures?
> A. No.
> Q. Okay. By you, did someone at Edwards Architects to your recollection make that decision on its own to change to T-5 fluorescent fixtures?
> A. No.
> Q. To your recollection, you believe this e-mail from October 18th, 2012, was your direction in part from Mr. Riddle to make that change?
> A. Correct.

Doc. 135-9 at 20. Thus, a dispute of fact exists as to if and when Riddle gave direction to others

regarding the light fixtures and whether that advice or directive was consistent with the DID

requirements.

Riddle informed those in attendance at the pre-construction meeting that Gensler had so

far approved an extruded ACM product at 17 other GMFI projects across the Midwest and that

the extruded ACM product was less costly than the ACM products listed in the DID. Doc. 131 at

9–10.

Riddle's next purported statement of fact is disputed by counsel's own citations. Riddle

asserts that, "[a]t no time did Riddle recommend to Davis that Davis use the extruded ACM

product in lieu of the DID-listed ACM products. In fact, Riddle sent the correct rainscreen ACM

purchase order to Jarvis on November 7, 2012." Doc. 131 at 10, ¶ 30. Yet the deposition of

Russell Arbuckle of EA, which counsel cites in support, states:

> Q. And in particular Exhibit 22, that highlighted portion on page 1, indicated that Mr. Davis determined at the time that the project would proceed with the one-piece extrusion system in contradiction to the construction documents and the GM/Gensler specifications because Mr. Davis was assured by Mr. Riddle that such system had been approved by GM/Gensler at other dealerships prior, and it was a significant cost savings.
> Q. My question is is that an accurate statement?
> A. That's my belief, yes.

Doc. 131-43 at 157 (Arbuckle Deposition) (emphasis added). Moreover, it also appears a dispute of fact exists as to whether the ACM installed on the building was in fact a rain screen system as suggested by the purchase order, or whether it was an extruded system or route and return system, or whether the ACM could be more than one of the options identified above. The parties go to great lengths arguing over what type of system was installed, but neither counsel nor the Court are knowledgeable of the particulars of aluminum composite cladding fabrication and installation. One final note on this subject: Riddle also cites to his deposition testimony in support of the above statement. Therein, Riddle asserts, "I don't make recommendations, and I don't' direct people to make decisions on anything. I simply, merely informed them that this extruded Rout & Return system had been used on other GM dealers and had received review and approval from Gensler, includ[ing] three dealers that had received final verification and approval and were completed." Doc. 131-42 at 1 (Riddle Deposition) (emphasis added). The above representation flies in the face of Riddle's main theory of the case—that he was a consultant rather than a project manager. If Riddle's position is indeed that he did not provide recommendations or direction, then he failed to meet his end of the bargain regardless of his title. If a consultant does not recommend, what purpose does he have? These questions remain unanswered throughout the summary judgment briefing.

Riddle's next purported statement of fact—that Davis stated that he had no recall of ever discussing ACM or electrical fixture issues with Riddle at any time—is supported by a citation to Davis' deposition testimony. Yet Davis later testified in his deposition that Riddle directed the selection of the ACM and the ACM was selected upon Riddle advising him that the ACM would

be found compliant and would save him money. Doc. 141-22 at 71.[8] This statement is therefore in dispute.

Arbuckle stated he discussed the ACM issue with Davis either at the preconstruction meeting on April 17, 2013 or soon thereafter, informing Davis that the extruded ACM product was not one of the DID-listed ACM products and its use would be in contradiction to the DID and EA's plans and specifications. Following the pre-construction meeting, Arbuckle stated that Davis chose the extruded ACM product as it was being approved by Gensler at other GMFI dealership projects and would save costs. Arbuckle stated that, as an architect, he would not overrule or counsel Davis against using an ACM product not listed in the DID. According to Arbuckle, Davis' use of the extruded ACM product was an owner's decision and it was not his role to go over the owner's head. Catalyst commenced construction on June 17, 2013, using EA's unapproved plans and specifications instead of the Gensler-approved plans. Catalyst submitted a set of shop drawings for the extruded ACM product to EA for review and approval. EA approved the extruded ACM on July 12, 2013 by affixing EA's "approved" stamp to the shop drawings despite the extruded ACM being in contradiction to the DID. Catalyst understood EA's "approval" of the ACM shop drawings to mean that it could proceed to order and install the extruded ACM. Doc. 131 at 10.

Riddle also asserts as undisputed fact that he was not notified by anyone that the extruded ACM had been approved for use until he saw the extruded ACM being installed on the Davis facility in late July, 2013. Doc. 131 at 13. Riddle testified to the same, but Andy Kaufmann of Catalyst Construction testified to the contrary at his deposition, stating it was Riddle who

---

[8] The depositions submitted by Davis are scanned pages of four-to-a-page transcripts. The Court has read all of the 700+ pages of deposition testimony of Davis and Riddle in a blurry size-six font. In the future, the Court asks counsel to submit legible, non-scanned PDFs where possible.

recommended the ACM system that was ultimately rejected by GM. Doc. 134-14 at 8. This statement of fact is thus in dispute.

Catalyst supplied the construction manager and/or site supervisor for each day work was being done on the project. When asked what role Riddle had if EA and Catalyst were providing construction managers and site specialists, Davis stated that he didn't know the answer to that question but later deferred to the terms to the Davis-Riddle agreement. Doc. 131 at 11; Doc. 141 at 14.

Riddle next asserts that in late June of 2013 he was at the Davis facility and saw the fluorescent fixtures were being installed in the showroom. According to Riddle, he called Zingre of EA to inquire why fluorescents were being installed instead of the Gensler-approved recessed halogen fixtures. Zingre informed Riddle the fluorescents had been approved. She later stated she had no recall of Riddle's email or call. Davis does not dispute that Zingre did not recall the email or call, but disputes the remainder of the statement on the basis that Riddle knew what was being installed for lighting because Riddle specified as much in his October 18, 2012 email, which Zingre took as a direction to change the approved plans to fluorescent fixtures. This statement is therefore in dispute. Doc. 141 at 14–15.

Riddle followed up by contacting GM's lighting consultant, Wiedenbach-Brown (WB), to check on whether WB had issued any approvals for the fluorescent fixtures. Upon learning that WB had not given such approval, Riddle had WB provide him with a typical showroom lighting plan layout and product cutsheets for the required recessed fixtures mandated in the DID. Doc. 131 at 11.

Riddle's next purported statement of fact relies on Riddle's deposition testimony to assert what Zingre knew or was thinking. Since Riddle does not purport to read minds and Davis

properly objected to this speculative statement, the Court finds it to be disputed. Doc. 141 at 27.

Zingre stated she had received the Riddle email with the lighting plan and fixture cutsheets,

dated July 3, 2013. Zingre stated she never consulted with WB on proper lighting fixtures. Davis

disputes this purported fact (1) as irrelevant because Davis takes the position that it was Riddle's

duty under the agreement to obtain GMFI approval, and (2) because Casey Garwood of GM

testified dealers were not required to use Weidenbach-Brown or any of the lighting vendors

identified in the DID. Doc. 141 at 27. This fact is thus disputed.

Zingre stated that she never specifically spoke with Riddle regarding the changes she

made to the showroom lighting plan and fixture specifications or contacted Riddle concerning

Riddle's email to John Kunski dated November 7, 2012. Zingre further stated that a month

earlier, the same fluorescent issue came up at S & K Buick in Springfield, IL where the

fluorescents had to be augmented with recessed LED fixtures. Zingre also stated that Quick

Electric Co. had indicated that other fixtures had been approved by GM on prior projects.

Riddle's next purported statement of fact is really two. It is undisputed that Riddle never

had a contractual relationship or agreement with EA. However, Riddle also asserts "Arbuckle

stated that Riddle's email to Kunski was not a design directive to EA." Doc. 131 at 12. The

citation in support of that statement refers to Arbuckle's deposition testimony, where the

following exchange occurred:

> Q. And so Exhibit 27 was, like you just testified, was in no way a direction for you
>    to do anything since it wasn't even directed to you, was it?
> A. Not specifically. This was not a direction to me, no.

Doc. 131-45 at 4. As Davis correctly argues in his response, Arbuckle's statement refers to him

personally, not necessarily to EA. Further, Davis points to Zingre's deposition testimony where

she states that she understood the Riddle email as a directive to change the approved plans. Doc. 141 at 15. This statement is therefore in dispute.

Davis stated that he had the Gensler-supplied DID binder and EA's plans and specifications in his possession at all times during the GMFI project and had reviewed them. Davis also stated that he had reviewed the DID requirements with Jarvis, Arbuckle, and Riddle prior to the commencement of construction. Davis further stated he had repurposed the fluorescent fixtures removed from his Buick showroom over to his Ford dealership store.

Davis stated that he hired his own painter instead of using the painting subcontractor that Catalyst had engaged, but that he did not provide his painter with the DID painting pictorials or EA's painting specs showing the required three-color painting format. Davis discussed show room area paint color with Catalyst and stated that he wanted the shop color lighter or darker. Davis stated that he never contacted EA or Catalyst's on-site construction manager concerning the painting specs or what colors were to be used in the service lane and shop area. Davis stated that Riddle told him to paint the shop area "all white." Davis stated that he would have painted the shop pink if he had been told to do so and would not have checked with anyone else. The parties dispute whether Riddle ever told Davis to paint the shop area all white. Doc. 131 at 13; Doc. 141 at 16.

The parties do not dispute that Davis and his daughter prepared and submitted the first Verification Request to Gensler on July 30, 2014. The parties do dispute whether that was done "without any consultations with Riddle prior to doing so." Doc. 131 at 13. Davis maintains Riddle had not contacted Davis for months. Doc. 141 at 16. To the extent Riddle suggests that Davis and Riddle never discussed the information which would eventually make its way into the 1st Verification Request, that statement is in dispute.

The next of Riddle's purported statements of fact requires a more detailed discussion due to both the way Riddle's counsel drafted the statement and the way Davis' counsel responded. The statement as issue reads:

> 55. Gensler found Davis' 1st Verification Request non-compliant on August 22, 2014. (Exh. 6; Exh. 39, p. 98). Many of Gensler's non-compliant findings centered on Davis' failure to get exceptions approved before submitting its 1st Verification request. One of those exceptions was to eliminate the full-height service lane/shop service wall. Davis and Riddle reengaged in late August, 2014, and Davis asked Riddle to get the non-compliant issues resolved and approved. Riddle submitted all the needed exception requests to ZM, Jarvis, but he mistakenly overlooked the separation wall request. Had Davis consulted with Riddle before submitting its 1st request, all of the exceptions would have been approved before submission to Gensler. (Exh. 40, pp. 207-213).

Doc. 131 at 13–14, ¶55. This Court's Local Rules provide that a motion for summary judgment must "list and number each undisputed material fact . . . . For each fact asserted, provide citations to the documentary evidence . . . ." CDIL L.R. 7.1(D)(1)(b). The rule does not purport to define with particularity what constitutes a "fact," and as a practical matter counsel are given some latitude to include more or less information in each statement of fact as the circumstances require. Yet the above statement is not directed toward a single fact, but is rather a summary of many of them. This Court's Local Rules contemplate a *statement* of material *fact* being presented in a summary judgment motion, not a *paragraph* of *many facts*. Davis' counsel takes issue with Riddle's summary judgment motion for this very reason. *See* Doc. 141 at 3.

Yet Davis' counsel has also erred. He responded to this purported statement of fact in two separate portions of his Response. First, under the heading "undisputed material facts," Davis states, "55. Gensler found Davis' 1st Verification Request non-compliant on August 22, 2014." Doc. 141 at 7. Later, Davis includes statement 55 under the heading of disputed material facts. In the response that follows, Davis states:

Riddle had not been in contact for months. (Davis Aff., ¶20; Davis 170-171). The Third Verification Record listed the exceptions that had been granted on Davis' facility as of October 1, 2015. (Garwood 122, Ex. 3). The only exceptions submitted on the Davis project were as follows:

> a. Exception 19284 (submitted September 24, 2014), which was associated with existing bronze moldings and a knee wall (Garwood 123, Ex. 12 at GM000000264);
>
> b. Exception 19285 (submitted September 24, 2014), which was associated with painting of exterior brick rather than covering with ACM (Garwood 123, Ex. 12 at GM000000265);
>
> c. Exception 19286 (submitted September 24, 2014), which was associated with the caulking of an ACM reveal joint on the Entry Element (Garwood 123-24, Ex. 12 at GM000000268);
>
> d. Exception 19866 (submitted January 30, 2015), which was associated with the new vehicle delivery area (Garwood 124-25, Ex. 12 at GM000000270);
>
> e. Exception 20419 (submitted July 23, 2015), which was associated with the service drive wall, installing compliant metal halide fixtures in the reception drive aisle and shop area, and painting the metal in the shop area to compliant colors so the shop was EBE compliant (Garwood 125, Ex. 12 at GM000000274).
>
> (See Garwood 121-29, Ex. 12).

All of the above listed exceptions were submitted after the First Verification Record, as the First Verification Record was generated on August 22, 2014. (See (See Riddle 108, Ex. 12). Davis was unaware that exceptions had not been obtained by Riddle prior to any verification submission. (Davis Aff., ¶ 20).

Doc. 141 at 16–17. Given Davis' thorough response and the importance of the issue of exceptions and exception requests to the summary judgment disposition, the Court chooses to overlook Davis' error in representing that this fact was not in dispute.

In his next purported statement of fact, Riddle asserts "[t]he 1st Verification Record found the ACM product itself compliant. The only noncompliant matters involving the ACM on the 1st Verification Record had to do with several construction issues by Catalyst, namely, a non-compliant flashing at the top of the entry "eyebrow," and a sealant joint problem on the black portion of the Entry Element." Doc. 131 at 14. Davis objects to this statement and also refers to the 1st Verification Record in support. The 1st Verification Record, under the heading "Entry Element" and subheading "ACM Construction" provides:

All ACM (both on the façade and on the entry element) must be either a rout and return or a rain screen system with 1/2" to 3/4" wide reveals. Dry joint systems are required. Batten, molding or field-cut "sheet and stick" systems are not acceptable. The ACM joint color must match the color of the adjacent ACM panel.

Doc. 131-6 at 2. Under this section is another heading: "Compliant?" Check boxes follow. The check box for "Construction" is marked not compliant. Similar language is used under the "ACM" heading. *Id*. at 2–3. Based on the above, the 1st Verification Record is at least ambiguous as to whether the correct ACM material was used and whether the ACM initially installed on the building was deemed complaint in the 1st Verification Record. Again, the parties go to great lengths arguing over what type of system was installed, but neither counsel nor the Court are knowledgeable of the particulars of aluminum composite cladding fabrication and installation, and the exhibit both parties rely upon for support is ambiguous.

Returning to undisputed facts, the 1st Verification Record found the showroom lighting non-compliant as it was not in accordance with the Gensler-approved CDs. The 1st Verification Record found the finishes (painting) non-compliant in the service/shop area as the color was not as specified in the approved CDs. The 1st Verification Record found the storefront glazing non-compliant as there was no clear glass as required in the DID and the approved CDs. Davis stated that it had installed darkening window tinting on its storefront glazing prior to enrolling in the GMFI Program and before hiring Riddle. Doc. 131 at 14.

It should be abundantly clear to both the parties and the Court that Riddle's next purported fact is in dispute. Riddle asserts Davis told him he was going to take a "breather" to "reload his financing" and Riddle then reminded Davis of the GMFI gate requirement deadline approaching and that the exceptions had to be approved by Jarvis first. Riddle asserts Davis indicated he would "be in touch" but after not hearing from Davis for 11 months, Riddle "reengaged" with Davis in late August 2014. Predicably, Davis remembers things differently.

Davis' version of events conflict with Riddle's in just about every way. Davis adamantly denies ever suggesting a break or "breather." Rather, Riddle simply hadn't been in contact for months, and Riddle was not the one to reinitiate communications. Finally, Davis was under the mistaken impression that Riddle had submitted everything to GM. Doc. 141 at 19. Both parties have identified deposition testimony that supports their conflicting positions. This statement is thus in dispute.

The 2nd Verification Record, completed on May 29, 2015, found the following elements non-compliant but "with approved exception": the entry element construction; the ACM construction; the exterior, the storefront, and the showroom lighting. The service reception lane and service area continued to remain completely non-compliant due to Jarvis mistakenly omitting a page from the document when submitting it. *Cf.* Doc. 131 at 15; Doc. 141 at 19–20. The service lane wall exception request was cleared and found complaint on the 3rd Verification Record. In September of 2015 and prior to submitting the 3rd Verification Record, Gensler asked for a close-up photo of the ACM joints on the Davis façade that had been installed two years earlier in August of 2013 and approved on the 1st and 2nd Verification Records. Davis supplied the photo and, on receipt, Gensler changed its previous position and found the extruded ACM non-compliant on the 3rd Verification Record. Davis does not dispute this statement but argues it is immaterial because Riddle knew far in advance of that date that the ACM had been called into question and he knew there was a chance it could be rejected. Doc. 141 at 32.

In October of 2015, Davis requested Riddle to find a supplier of ACM that would meet Gensler's approval, which Riddle did, obtaining a rainscreen ACM system from Ram North America that could be overlaid on top of the existing extruded ACM at a cost of $41,150. The combined cost of the original extruded ACM, at $79,500, plus the Ram overlay at $41,150,

totaled $120,650, which was $6,110 less than if Davis had installed the original rainscreen ACM that had been bid to Catalyst by Mid-Illinois Construction Co. in the sum of $126,760. Davis does not dispute this statement but argues it is immaterial because Davis had to re-do the ACM recommended by Riddle and it would have cost him less if did not have to re-do it. Doc. 141 at 33.

Davis stated he received all GM funding for his GMFI project. GM tracked Davis' GMFI progress through the timeline "gates" by providing to Davis a quarterly EBE Progress Summary via Davis' password-protected GMFI "dashboard." Those summaries showed whether Davis was green, yellow, or red for any particular quarter. Green signified Davis was compliant in its progress through the GMFI timeline gates; yellow indicated Davis needed to take action in order to regain green status; red indicated Davis was not compliant with the GMFI progress timeline. Davis would receive its GM funding for all green quarters several weeks following each such quarter. GM funding was escrowed during yellow quarters and paid as soon as Davis regained green status. No GM funding was lost for any quarters. Doc. 131 at 16.

Davis stated in his deposition that he didn't know what GM funding payments were late, if any, or what he might have paid in interest on account of any late funding from GM. Doc. 131 at 16. Davis disputes this statement of fact because Davis later submitted an affidavit in support of his summary judgment motion which clarifies that approximately $84,000 was delayed to Davis based on the delays in the project, and it was not paid to Davis until 2016. Doc. 141 at 20. The statement is undisputed as it pertains to this summary judgment motion.

Davis was required under the Agreement to pay Riddle the sum of $35,000.00 in consulting fees on a monthly schedule of payments. The payment schedule required the first 10

months be paid at $1,500.00/month, and the following 10 months at $2,000.00/month. In 2014, the parties modified the $2,000.00/month schedule to $1,000.00/month. Doc. 131 at 16.

The parties dispute whether Davis paid Riddle all sums due to him under the Agreement. Riddle asserts Davis was 11 months' delinquent for payments due on October and November of 2013, and at the time Gensler issued the final Verification Record, Davis still owed Riddle $2,500 plus $43.78 in unreimbursed expenses. Doc. 131 at 16–17. Davis' Response references the letter from Davis' prior counsel to Riddle which included a check for $3,243.78 and asserts that "[a]s of Invoice No. 11-1325, Davis had paid everything just short of the last $2,500." Doc. 141 at 21. However, Davis acknowledges subject to the satisfaction provisions that the sum of $2,500 plus $43.78 remained due as of the final Verification Record.

The parties agree Riddle invoiced Davis for the $2,543.78 on May 1, 2016, net due in 7 days, following Gensler's final approval on April 25, 2016, and that Davis did not initially pay Riddle the $2,543.78 as invoiced. The parties also agree Riddle invoiced Davis again on May 15, 2013, this time adding $700.00 in contractual late charges. However, the parties disagree as to the contract provision regarding late charges and when the charges began to accrue. Riddle believes it was 7 days after receipt of the invoice; Davis says 15. The agreement supports Davis' interpretation. *See* Doc. 131-1 at 5. Similarly, Riddle claims that as of June 1, 2020, Davis owes $150,343.78. Davis disputes this, arguing his final check covered all sums due to Riddle including late fees. Doc. 141 at 22.

Riddle's next purported statement of fact alleges:

73. Davis attempted to pay invoice 11-1326R on May 24, 201[6]. Given that the attempted payment was 3 days late, Riddle returned the check, which was then in the wrong amount. Davis has not paid or tendered into court any sums since May 24, 2016, even though Riddle has continued to invoice Davis each month to the present. (Exh. 14, pp.2-5ff).

Doc. 131 at 17. Davis failed to respond to this purported statement of fact. However, the Court's review of Riddle's citations in support of this statement are lacking, referring the Court only to the invoices Riddle continued to send Davis. Thus, the Court considers as undisputed only the portion of the above statement that is supported by the cited evidence—that Riddle continued to invoice Davis each month to the present.

Riddle had RAM North America overlay a rainscreen ACM on top of the non-compliant extruded ACM at Davis' request. Gensler found the ACM installed by RAM compliant on the 4th Verification Record on April 25, 2016. The 4th Verification Record completed the Davis GMFI project.

Riddle's last statement of fact reads: "Davis stated that he never gave Riddle any notice of breach, termination or notice to cure at any time. Davis never indicated to Riddle that he was dissatisfied with Riddle or claimed that Riddle was in breach of their Agreement." Davis affirmatively lists this fact as undisputed (Doc. 141 at 9), but also lists the same fact as a disputed material fact. *Id.* at 23. In any event, it is clear that by the time Davis' counsel sent the letter to Riddle with final payment, Riddle knew Davis was not satisfied with his services.

**ADDITIONAL MATERIAL FACTS**

Davis lists 50 additional material facts in his Response. Doc. 141 at 33–40. Riddle responds to these additional material facts in part of his Reply. Doc. 148 at 24–38. Those will be discussed below. However, Riddle impermissibly attempts to reply to Davis' responses to Riddle's statement of material facts. *See* Doc. 148 at 1–23. Nothing in the federal or local rules permits this practice, and for good reason—it muddies the waters and invites summary judgment movants to hide the ball in their opening brief so they may get the last word in the reply brief. Accordingly, the first 23 pages of Riddle's Reply will not be considered by the Court. Further,

many of the responses that purport to dispute Davis' statements of additional material fact either fail to cite to evidence in support or do not in-fact attempt to dispute the statements offered by Davis. Where this occurs, the Court will note as much with a footnote. For example, Davis' first purported additional material fact states: "Exceptions" are variances from the approved construction documents." Doc. 141 at 33. Riddle's response to this purported fact reads: "Generally, this is correct in a generic sense; however, Riddle disputes it as there was no duty on him to obtain exceptions in Exh. 1, as the word, exception, was never mentioned in the Agreement." Doc. 148 at 24. This example perfectly illustrates the frivolity of many of Riddle's responses. The purported statement never even mentions Riddle. The first statement is not in dispute.

The parties dispute whether a dealer would need to submit new construction documents if they were granted an exception by GM. Doc. 148 at 24. Exceptions could be submitted to the GM Zone Manager for ultimate approval by GM, which would trump Gensler during the verification process.[9]

The parties dispute whether it is Gensler or the Zone Manager who reviews exception requests, but agree GM has the final say. Doc. 148 at 24–25. In this case final decision-making authority rested with GM's Assistant Manager for the GMFI program and EBE, David Bonifas. Riddle would typically draft the exception request to GM.[10] The Zone Manager would then need to make the formal submission of the exception request online.[11] There are no specific guidelines

---

[9] Riddle fails to cite.
[10] Riddle fails to cite.
[11] Riddle does not really dispute, fails to cite.

for granting or denying exception requests.[12] The 3rd Verification Record listed the exceptions that had been granted on Davis' facility as of October 1, 2015.[13]

> The only exceptions submitted on the Davis project were as follows:
>
> a. Exception 19284 (submitted September 24, 2014), which was associated with existing bronze moldings and a knee wall (Garwood 123, Ex. 12 at GM000000264);
> b. Exception 19285 (submitted September 24, 2014), which was associated with painting of exterior brick rather than covering with ACM (Garwood 123, Ex. 12 at GM000000265);
> c. Exception 19286 (submitted September 24, 2014), which was associated with the caulking of an ACM reveal joint on the Entry Element (Garwood 123-24, Ex. 12 at GM000000268);
> d. Exception 19866 (submitted January 30, 2015), which was associated with the new vehicle delivery area (Garwood 124-25, Ex. 12 at GM000000270);
> e. Exception 20419 (submitted July 23, 2015), which was associated with the service drive wall, installing compliant metal halide fixtures in the reception drive aisle and shop area, and painting the metal in the shop area to compliant colors so the shop was EBE compliant (Garwood 125, Ex. 12 at GM000000274).

Doc. 141 at 34. Riddle understood that the exceptions would be needed in order to vary from the DID and approved construction documents.[14]

The parties dispute whether Davis was aware that exceptions had not been obtained by Riddle prior to any verification submission. Doc. 148. at 27. The parties dispute whether ACM was discussed at the preconstruction meeting on or about April 17, 2013. Doc. 148 at 27.

Catalyst's proposal noted the ACM panels would be Metro Lakes.[15] On July 12, 2013, Edwards "approved as noted" shop drawings associated with the ACM.[16] The "approved as

---

[12] Riddle does not really dispute, fails to cite.
[13] Riddle disputes this fact and argues exceptions are not listed on the 3rd Verification Record. The Court has reviewed the document in question and it lists approved exceptions. Riddle is thus mistaken. *See, e.g.,* Doc. 135-5 at 9.
[14] Riddle disputes this statement because the term "understood" is vague. Doc. 148 at 26. The Court understands the meaning of "understood." Furthermore, Riddle fails to cite anything in support of the purported dispute.
[15] Whether Catalyst "called out" the ACM as being non-compliant is disputed.
[16] Riddle disputes this based on what Catalyst "understood" but that has nothing to do with the statement at issue. Doc. 148 at 28.

noted" stamp was not compared to the DID but was rather for "general conformance with design concept."[17] Arbuckle testified at his deposition that "[t]he concept is very different than the specific product, so yes, it is based on the DID and the design concept had to do with where the material was to be placed and what color the material was and what sizes of bands they needed to be and such like that."[18]

On August 8, 2013, Riddle sent an email to General Motors regarding his pending projects.[19] The email provided that "[s]everal recent Final Verification Reviews have come back to dealers with comments regarding the reveal joint on the ACM installation.[20] Riddle acknowledges in this letter that the Metro Lakes system that was installed on Davis' facility was not a "rainscreen" or "route and return" system.[21] Riddle stated in his letter that the Metro Lakes system "will perform and provide a life expectancy comparable to a rainscreen or rout and return ACM system."[22] Riddle initiated the August 2013 email because "it was becoming apparent that the EBE design requirements had changed from the earlier DID versions."[23]

On October 18, 2013, Riddle authored a letter to Gensler that acknowledged "a number of Final Verification review comments have been noted as 'Appears to be a batten system' and denied approval on several EBE dealership facilities."[24] Riddle admits in the letter that he had

---

[17] Riddle disputes this fact but his dispute does not alter the words on the document. Further, Riddle fails to provide a citation in support of his dispute.
[18] Riddle's dispute is more appropriately included in the argument section of his brief. Doc. 148 at 28.
[19] Riddle's objection is clearly inappropriate. Riddle either sent the email or he didn't. Riddle does not dispute he sent the email, so his objection is really just another inappropriate attempt to argue his case in the fact section.
[20] Riddle does not really dispute this.
[21] Riddle disputes what is stated in his letter by referencing Riddle's deposition testimony, but the language of the letter is what is at issue. The letter appears to differentiate the Metro Lakes system from a rain screen system. Doc. 148 at 29–30.
[22] Riddle again lists this fact as disputed immediately before conceding the accuracy of the quoted statement. Doc. 148 at 30.
[23] Same.
[24] Same. Doc. 148. at 31.

not been keeping up to speed on the ACM requirement changes.[25] Riddle had notified Metro Lakes' Richard Kuppe to advise him that the system had been "called into question  by Gensler" at the time of this email.[26] Catalyst was also aware that Riddle had knowledge that the ACM was an issue in late 2013.[27] Between the two letters, Riddle acknowledges that he knew Gensler/GM was rejecting the Metro Lakes system.[28] On February 24, 2014, Kaufmann inquired as to whether Davis had been required to replace his ACM panels.[29] Riddle replied, "John has not been directed yet as he has not submitted for Final Verification. That will put him on radar with Gensler/GM."[30] The parties dispute whether Riddle responded to Kaufmann.[31] Riddle never asked Catalyst to halt construction prior to the installation of the ACM by Metro Lakes.[32]

The 1st Verification Record was generated on August 22, 2014.[33] No exception requests were ever made to request an alternate ACM system on the Davis facility, though the parties dispute whether it was possible to submit an exception request for this product.[34] Davis was required to redo the ACM in order to make his facility complaint.[35]

---

[25] Riddle disputes this, but his own letter acknowledges DID version 7.0 required a rout and return system, unlike prior versions of the DID. Doc. 135-3 at 6.

[26] Riddle again lists as disputed before immediately conceding the accuracy of the quoted statement. Doc. 148 at 31.

[27] Riddle again lists as disputed before immediately conceding the accuracy of the quoted statement. Doc. 148 at 31.

[28] Counsel lists this as disputed but the statement came from the statement of his own client at his deposition. *See* Doc. 135-1 at 31 (Q. "So between August 8, 2013, and October 10, 2013, now you know that they are rejecting them; its no longer in question?" A. "Right…"

[29] Riddle's response fails to provide a citation and fails to dispute the statement at issue. Doc. 148 at 32.

[30] Same frivolous objection, same result.

[31] Davis cites to "Kaufman, Ex. C" yet the Court is unable to find that exhibit. Where Riddle agreed to the language used therein, the Court has accepted the statement as an undisputed fact. However, the Court finds this statement disputed because Riddle disputes it and the Court cannot confirm one way or the other without the exhibit. Further, Davis did not include the required citation to the page number of the exhibit. The fact is thus disputed.

[32] Riddle's response does not really dispute the statement at issue and fails to provide a citation. Undisputed. Doc. 148 at 32–33.

[33] Riddle does not really dispute. Doc. 148 at 33 ("Disputed as to the import on Riddle").

[34] Undisputed as written.

[35] Riddle asserts Davis could have challenged Gensler's finding. He fails to provide a citation in support of that statement, so the Court disregards it.

On or about December 22, 2015, Russell Arbuckle wrote a letter to Andy Kaufmann of Catalyst regarding "ACM Panel overlay at Davis Dealership."[36] The ACM Letter stated, "First, to be perfectly clear, it is our understanding that the Laminators, Inc. One-piece, tight fit extrusion system that was originally installed has now been rejected as non-conforming and unacceptable by GM/Gensler. As I'm sure you recall, we discussed this very issue at John Davis' office with John Davis and Scott Riddle prior to the signing of the Contract for construction."[37] The ACM Letter continued, "Mr. Davis determined at the time that the time that the project would proceed with the one-piece, extrusion system in contradiction with the construction documents and the GM/Gensler specifications because Mr. Davis was assured by Mr. Riddle that such system had been approved by GM/Gensler at other dealerships prior and it was a cost savings."[38]

Riddle's response to the next additional material fact is another great example of the inappropriateness of his summary judgment strategy. The fact: Riddle only initially provided one ACM supplier to Catalyst—Metro Lakes Construction. Doc. 148 at 35. In response, Riddle's counsel writes "This is an outright untruth. Kaufmann testified that he got a much higher bid from Mid-Illinois …." Both parties refer to the same deposition testimony of Andy Kaufmann. That testimony clearly indicates that the Metro Lakes bid came first, and the Mid-Illinois bid came later. Thus, the statement that Riddle only *initially* provided one ACM supplier is undisputed. Davis' next statement expounds on the above fact and Riddle again ignores the word "initially," so the Court ignores this response as well. In relation to manufacturers of ACM,

---

[36] Riddle's objection is again irrelevant.
[37] Same objection. Undisputed.
[38] Riddle does not really dispute the contents of the letter.

Catalyst relied upon Riddle's experience and only really engaged with Metro Lakes.[39] Catalyst subcontracted out the ACM to Metro Lakes.[40] However, Catalyst was concerned about the Metro Lakes proposal and notified Riddle.[41] The ACM was finally approved by Gensler in the Fourth Verification Record on April 25, 2016.[42] Davis paid $40,600 to RAM North America for replacement of the ACM.[43] Davis also paid $22,320 to Quick Electric Contractors, Inc. for removing and reinstalling signs and a lift rental necessary to replace the ACM.[44]

Kaufmann testified at his deposition that Davis was relying on Riddle for his advice. Riddle stated the Metro Lakes system had been used and approved at other dealerships before. The remaining additional material facts are either irrelevant or legal conclusions. Doc. 148 at 38. This order follows.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

---

[39] Riddle disputes because Riddle asked Catalyst to reach out to Mid-Illinois. But the Court reads the statement to mean Catalyst spent much more time with Metro Lakes than any other ACM supplier.
[40] Riddle disputes something, but not what is stated in AMF 42. The statement is undisputed.
[41] Riddle disputes this statement from Kaufmann's deposition but does not point to anything to controvert the proposition that Catalyst was concerned and notified Riddle. Undisputed.
[42] Riddle disputes the use of the word "finally." It was the final approval, thus justifying the use of the word "final." This response borders on sanctionable conduct. *See* Fed. R. Civ. P. 11.
[43] Riddle doesn't really dispute. Doc. 148 at 37.
[44] Same. Undisputed.

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Thus, in order to overcome the undisputed facts set forth in a defendants' motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

**ANALYSIS**

Before addressing the parties' arguments, the Court notes Riddle has filed two separate motions for summary judgment, complete with their own statements of fact and argument sections. Docs. 131, 132. Yet Riddle also felt it necessary to submit another "Memorandum of Law" in support of both of his summary judgment motions. This is impermissible, was not authorized, and does nothing but muddy the waters even further than Riddle has done already. Document 130 is stricken and not considered by the Court.

Riddle moves for summary judgment on Counts 1, 2, and 4 of Davis' Complaint.

**Count 1: Breach of Contract**

To prevail on a breach of contract claim under Illinois law, a plaintiff must prove

"the existence of a valid and enforceable contract, the breach of the contract by the defendant, the performance by the plaintiff and the resultant injury to the plaintiff." *Allstate Ins. Co. v. Winnebago County Fair Ass'n, Inc.*, 475 N.E. 2d 230, 236 (2d Dist. 1985) (citing *Thilman & Co. v. Esposito*, 408 N.E. 2d 1014 (1980)). Here, the parties entered into a valid enforceable contract. Doc. 131-1. This element is therefore not at issue.

In order to be entitled to summary judgment on the breach of contract claim, Riddle must show no dispute of material fact exists regarding whether Riddle breached the agreement. As relevant here, the agreement provided:

**B. Definition Phase**
During the Definition Phase, Riddle shall provide the following services:
    1. Design Development
        a. Coordinate the design development work with Davis design professionals for the entire project. Design work to include considerations for:
            …
            v. Ensure General Motors EBE program approval for the project.
        b. Monitor development of design details of Davis's design professionals and review against the Project Requirements to determine effect of to determine effect of changes on the Preliminary Cost Estimates. Update project Requirements by incorporating proposed changes to design of Project.
        …
    2. Schedule
        a. Review design progress and impact of changes to project Requirements.
        …

**C. Implementation Phase**
    1. Management
Establish an on-site Project administration and communication system including the following:
        a. Change order procedures and approval protocol.
        b. Schedule monitoring and updating procedures.
        …
        d. Materials procurement and inventory procedures.
    2. Construction
        …
        b. Establish bi-weekly schedule job site coordination meetings to discuss progress of the work, review changes, update material delivery status and design clarifications.
        c. Review Procedures and activities to:

                i. Validate quality of construction, installation and systems integrity.

                ii. Fulfill design intent

                iii. Complete work in a timely fashion.

                iv. Implement cost-effective methods.

                v. Monitor current information and timely and accurately communicate information to all team members.

                vi. Ensure compliance of requirements for GM Design Image approval.

        d. Review and Value Engineer building elements and image elements for cost reduction opportunities.

     <u>3. Procurement</u>

        a. Review and assist Davis with procurement of equipment and major systems:

                i. Identify equipment suppliers that would be appropriate and effective for Davis.

                ii. Define work scope requirements and solicit proposals from qualified Contractors.

                iii. Solicit bids from pre-qualified Contractors and equipment vendors.

                iv. Coordinate the delivery of equipment with the context of the Project Schedule.

Doc. 131-1.

Davis alleges Riddle breached the agreement in multiple respects:

(1) Unbeknownst to Davis, Riddle failed to utilize and instruct Davis' contractors and architects to utilize the construction plans that had been previously approved by GM in the design and construction of the Davis dealership remodeling project and instead used (and directed others to use) plans that had not been approved by GM, or otherwise without approved exceptions, causing several parts of the Project to have to be redone.

(2) After Riddle had gone "missing" for some time and had not communicated with Davis for months, Davis learned from GM that Riddle had failed to submit the First Verification Record to Gensler, causing Davis and his daughter to have to complete such Record and submit it to Gensler. Due to Riddle's lack of involvement and/or direction, multiple items (almost 20) of the First Verification Record were found by GM to be non-compliant.

(3) Despite Riddle being aware that the ACM system selected for Davis' facility was being called into question by GM, Riddle never advised the contractors or subcontractors to halt installation or otherwise not install the ACM system purchased through Metro Lakes.

(4) Riddle never submitted an exception request for a different type of ACM to be installed on Davis' facility after learning that it had been called into question.

(5) Riddle submitted the Second Verification Record and included many of the same non-compliant items as were contained within the First Verification Record.

(6) Riddle submitted the Third Verification Record with additional non-compliant items.

(7) It took 4 submissions and almost 6 years for GM to approve the Project.

(8) Riddle made changes (exceptions) to the approved construction documents without seeking review or approval from Gensler for most of these variances, including for the ACM, lighting, window tinting, and painting.

(9) Riddle also admitted to not keeping "up to speed" on the ACM requirement changes and, despite his assertions to the contrary, directed Davis' architect to use the non-compliant ACM. In other words, it was Riddle's idea to utilize the ACM that was found to be non-compliant.

(10) Riddle failed to notify Davis of critical issues with the materials being suggested by Riddle.

(11) Riddle failed to meet with Davis, the contractor, subcontractors, and architects pursuant to the terms of the Agreement.

*See* Doc. 141 at 44–45.

In his Motion, Riddle argues he is entitled to summary judgment on the breach of contract claim because:

(1) Davis failed to pay Riddle's consulting fee in full as a condition precedent to filing suit;

(2) Davis failed to give Riddle notice of breach and an opportunity to cure, which was also a condition precedent to filing suit;

(3) Riddle was not contractually responsible for Davis' claims of breach. Rather, any errors were caused by EA or Catalyst.

(4) Davis chose to use non-compliant ACM contrary to its architect's advice.

(5) Davis' architect specified the wrong showroom and service lane lighting fixtures without Riddle's input or knowledge.

(6) Davis failed to follow its own architect's painting specifications and the DID painting requirements that it had had in its possession from the beginning.

(7) Davis has no evidence to support its claim that Riddle owes Davis for removing its window film.

(8) There was no stated time-of-performance provision in the parties' Agreement.

*See* Doc. 131 at 18–35.

**Conditions Precedent**

Riddle first argues Davis failed to meet two conditions precedent to bringing a breach of contract claim. This argument references Section 3 of the Agreement, which the Court reproduces below.

**Section 3 — Miscellaneous Provisions**
<u>1. Default</u>
<u>In the event of a material breach of this Agreement by a party, the other party may terminate this Agreement upon thirty (30) day prior written notice,</u> providing that the breach has not been cured within said thirty (30) day period, or where the breach is not capable of cure within said thirty (30) day period or within a reasonable extension thereof. In the event of such termination for default, the non-defaulting party may seek all remedies available under law or under this Agreement against the defaulting party and will no longer be required to perform the duties set forth in this Agreement. In the event of Riddle's uncured breach, Davis will only be liable

> to pay Riddle for services rendered to the time of proper termination by Davis.
> Davis will be liable for Riddle's attorney fees and court costs should Riddle not be
> in breach of this agreement.

Doc. 131-1 at 6 (emphasis added). Riddle argues Davis failed to pay Riddle's final invoice and

failed to given written notice of termination to Riddle and time to cure prior to filing suit. Riddle

argues both of these conditions had to be met before filing suit. Doc. 131 at 18–22.

The Court first addresses whether Davis fully performed under the contract by paying

Riddle all sums due to him under the Agreement. Recall that Riddle invoiced Davis for the

$2,543.78 on May 1, 2016, net due in 7 days, following Gensler's final approval on April 25,

2016, and that Davis did not initially pay Riddle the $2,543.78 as invoiced. Riddle invoiced

Davis again on May 15, 2016, this time adding $700.00 in contractual late charges. Davis

attempted to pay invoice 11-1326R on May 24, 2013 by submitting a check for $3,243.78

accompanied by a letter dated May 23, 2016 from Davis' attorney. That letter stated "[t]his

payment is made under protest and by no means should be considered as satisfaction for any

claims that we may have against [Riddle] for the breach of his agreement." Doc. 131-13. Riddle,

through counsel, responded to the letter on June 1, 2016. Therein, counsel stated "[w]e are

enclosing the check you sent with your correspondence of May 23, as you put conditions on

acceptance of the check. Those conditions are not acceptable. If your client wishes to pay his bill

without conditions, then we will accept the same. The penalty is still running at $100/day if we

don't get together on this." Doc. 141-1 at 3.

Under the terms of the parties' Agreement, Davis was required to pay the invoice within 7

days of receipt. Doc. 131-1 at 5. If payment is not received within 15 days of receipt, Riddle will

be entitled to an additional $100 per day until payment of the invoice is received. *Id.*

Thus, Davis defaulted on the Agreement when he failed to pay the invoice by May 8. The $100 per day penalty began to accrue after 15 days, i.e., beginning on May 16. The invoice was finally paid on May 24, 2016, 9 days later. Thus, Davis should have cut a check for $3,443.78, not $3,243.78.[45] The Agreement provided that Riddle agreed to put at-risk the last payment if Davis was not satisfied with Riddle's performance. The parties dispute whether Davis ever provided Riddle with notice of his dissatisfaction, but certainly by the time Davis' counsel sent the letter with the last payment Riddle knew Davis was dissatisfied.

Riddle argues Davis' insufficient payment constitutes a material breach placing him in default on the agreement, and that payment in full was a condition precedent to Davis filing suit for breach of contract. Doc. 131 at 19. In contrast, Davis argues he substantially performed under the agreement, and asserts the issue of an incorrect amount on the check "is a later concocted argument by Defendant's counsel," pointing to Riddle's June 1, 2016 letter where Riddle's counsel rejected the check because of purported "conditions" placed on its acceptance. Doc. 141 at 41–42. Neither party directs the Court to relevant case law on the issue of substantial performance.

"Substantial performance of a contract means performance of all the essential elements necessary to accomplish the purpose of the contract." *A.W. Wendell & Sons, Inc. v. Qazi*, 254 Ill. App. 3d 97, 107, 626 N.E.2d 280, 289 (1993) (citing *W.E. Erickson Construction, Inc. v. Congress–Kenilworth Corp.* (1986), 115 Ill.2d 119, 126, 104 Ill.Dec. 676, 503 N.E.2d 233). "Under the doctrine of substantial performance, the general rule regarding building contracts is that a builder is not required to perform perfectly, but rather is only held to a duty of substantial performance in a workmanlike manner." *W.E. Erickson Const., Inc. v. Cong.-Kenilworth Corp.*,

---

[45] Riddle says the check was 3 days late and thus the payment should have been $300 more. The Court's count is different, but the exact number is not material to the Court's analysis of the issue. Doc. 131 at 19.

132 Ill. App. 3d 260, 264, 477 N.E.2d 513, 517 (1985), *aff'd and remanded,* 115 Ill. 2d 119, 503

N.E.2d 233 (1986) (citing *Brewer v. Custom Builders Corporation* (1976), 42 Ill.App.3d 668,

673, 1 Ill.Dec. 377, 356 N.E.2d 565). Thus, "[a] purchaser who receives substantial performance

of the building contract must pay the price bargained for, less an offset for defects in what he

received as compared to what strict performance would have given him. *Id*. (citing *Park v.

Sohn* (1982), 89 Ill.2d 453, 464–65, 60 Ill.Dec. 609, 433 N.E.2d 651; *Mayfield v.

Swafford* (1982), 106 Ill.App.3d 610, 612, 62 Ill.Dec. 155, 435 N.E.2d 953; *Brewer v. Custom

Builders Corporation* (1976), 42 Ill.App.3d 668, 673–74, 1 Ill.Dec. 377, 356 N.E.2d 565;

Restatement (Second) of Contracts Section 347 (1979)).

　　Here, based on the facts presented, the Court finds Davis substantially performed his

obligations under the contract when he submitted the payment for the final invoice on May 24,

2016. First, although Riddle argues Davis was required to give written notice of his

dissatisfaction and an opportunity to cure under the terms of the Agreement, Riddle is really

blending two separate provisions of the Agreement together. Section 2 merely provides that

Riddle will put at-risk the last month payment of $2,000 if Davis is *dissatisfied* with Riddle's

performance. Doc. 131-1 at 5, §2(1)(a)(iv). It says nothing regarding a breach of the Agreement.

Separately, Section 3 provides that "[i]n the event of a material breach of this Agreement by a

party, the other party may terminate this Agreement upon thirty (30) day prior written notice,

providing that the breach has not been cured within said thirty (30) day period, or where the

breach is not capable of cure within said thirty (30) day period or within a reasonable extension

thereof." *Id*. at §3(1). Based on the language of the Agreement, it is possible for Davis to be

dissatisfied with Riddle's services without Riddle having defaulted under the Agreement.

Second, the Agreement is unclear about how late payment penalties are to be paid and when they become due. The Agreement provides that "Riddle will be entitled to an additional $100 per day until payment of the invoice is received." Davis paid the May 1st invoice on May 24, 2016, so at this point the penalty fees should have stopped accruing. If Riddle wished to collect the extra $200 to $300 in late penalties due to him, he could have invoiced Davis again for only those fees. However, Riddle chose instead to return the check based on purported conditions attached to the payment. There were no conditions placed on the check, the correspondence merely warned Riddle that Davis might initiate a lawsuit. *See* Doc. 131-13 ("This payment is made under protest and by no means should be considered as satisfaction for any claims that we may have against [Riddle] for the breach of his agreement."). Instead of accepting that check, Riddle, through counsel, responded to the letter on June 1, 2016. Therein, counsel stated "[w]e are enclosing the check you sent with your correspondence of May 23, as you put conditions on acceptance of the check. Those conditions are not acceptable. If your client wishes to pay his bill without conditions, then we will accept the same. The penalty is still running at $100/day if we don't get together on this." Doc. 141-1 at 3. Given Riddle's refusal to accept final payment, Davis was not responsible for penalties beyond the $200 to $300 late fee. Since Riddle continued to send inaccurate invoices with excessive late penalties instead of a bill for a few hundred dollars, Davis was not required to continue to pay them. Especially so if Riddle conditioned the payment upon a waiver of all claims Davis might have against him. Finally, at the very least, the letter Davis sent to Riddle through counsel provided notice to Riddle that Davis was dissatisfied with Riddle's performance. Construing any ambiguities in the contract against Riddle, the drafter, it is at least plausible that Davis was entitled to shave up to $2,000 off the last invoice. In sum, any breach by Davis was cured upon his May 24 payment. If

Riddle wanted to pursue the additional $200 to $300 he was arguably entitled to, he should have accepted payment and sent a new invoice for the balance. Davis substantially performed his end of the bargain.

Riddle also argues notice of breach and payment in full were both preconditions to filing suit. Doc. 131 at 18–19. As Riddle reads the Agreement, Davis was required to give Riddle notice of default pursuant to Section 3. "A 'condition precedent' is an act that must be performed or an event that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform." *Credit Union 1 v. Carrasco*, 2018 IL App (1st) 172535, ¶ 15, 107 N.E.3d 1021, 1026. In making his argument, Riddle claims the language in Section 3 is mandatory and the exclusive procedure for resolving disputes under the Agreement. Davis, on the other hand, argues the language is permissive, and in any event a notice requirement would be nonsensical because by the time Davis sued for breach he had already compensated Riddle in full. Doc. 141 at 43. In support, Davis cites to *Merry Gentleman, LLC v. George & Leona Prods., Inc.*, No. 13 C 2690, 2013 WL 4105578, at *7 (N.D. Ill. Aug. 14, 2013). In that case, a dispute between a director and a production company contained the following notice and cure provision: "[Y]our employment and compensation hereunder shall automatically be suspended during any and all periods: (i) that you do not render services hereunder because of ... default (provided that [Merry Gentleman] agrees to notify you if you are in default and afford you seventy-two (72) hours to cure any default capable of cure))." *Id*. Addressing the director's argument that the production company failed to give the required notice and opportunity to cure before filing suit, the district court reasoned:

> Nothing in the pleadings suggests that Keaton's employment or compensation was suspended for any period of time; thus, Merry Gentleman's obligation in ¶ 4 to provide notice and an opportunity to cure never was triggered. In any event, ¶ 4 required Merry Gentleman to give Keaton notice and an opportunity to cure only

before suspending his employment and compensation, not before filing suit for breach. *See Wis. Alumni Research Found. v. Xenon Pharm., Inc.,* 591 F.3d 876, 888 (7th Cir.2010) ("[a] contractual obligation to provide notice and an opportunity to cure a default prior to terminating a contract does not necessarily affect the aggrieved party's right to sue for breach," where "nothing in the [contract] prevented [plaintiff] from suing for breach within the 90–day cure period"). It follows that the pleadings do not establish that Merry Gentleman has failed to satisfy the fourth element of its contract claim.

*Merry Gentleman, LLC v. George & Leona Prods., Inc.*, No. 13 C 2690, 2013 WL 4105578, at *7 (N.D. Ill. Aug. 14, 2013). Like the provision in *Merry Gentleman*, Section 3 of the parties' Agreement does not preclude Davis from initiating suit. Rather, that provision governs termination of the Agreement. Here, the Agreement was never terminated by either party. Davis chose to continue on with his payment obligations (albeit with some delay) rather than terminate the agreement, and he was free to do so. *See also Brewer v. Custom Builders Corp.*, 42 Ill. App. 3d 668, 672 (1976) ("In the absence of such an express reference, we are reluctant to find that the parties intended for a court action to be barred unless plaintiffs had first paid 98% of the contract price."). Further, the provisions in Section 3 only make sense for certain situations. Here, Davis' main claims involve delays resulting from work that was required to be redone. Under these circumstances giving notice would be pointless—Riddle does not have a time machine to go back and make the delays disappear. Therefore, the language of Section 3 was not a condition precedent to suit, and Davis is not barred from litigating his breach of contract claim.

**Whether Riddle was Contractually Responsible for Davis' Claims of Breach**

Next, Riddle argues he is not responsible for Davis' claims of breach. Doc. 131 at 22–24. Specifically, Riddle argues Davis' myriad claims of breach are found nowhere in the parties' agreement. While Edwards and Catalyst had their own contracts with Davis which included specific obligations, Riddle was merely a *consultant* who was to *assist* Davis in navigating the GMFI program. *Id*. at 22. Given the numerous disputes of material fact set forth in detail in the

background section of this Opinion, Riddle's attempt to win summary judgment on the breach of contract claim was doomed from the beginning. Even if Riddle's responsibilities were merely to consult and advise, he may still be liable to Davis for failing to do so. The Court will not belabor the point by going line by line through each disputed material fact. However, a few examples will be provided to show why neither party should have wasted their time bringing summary judgment motions on the breach of contract claims. First, the ACM. Is the Metro Lakes system the same or equivalent to what was called for in the DID? It appears Riddle himself provided contradictory answers to this question. *Cf.* Doc. 131-42 at 1 (wherein Riddle states the ACM bids from the two suppliers were for different materials and the Metro Lakes bid was for an extruded rout & return system, not a rainscreen system); Doc. 131-26 at 2 (purchase order for ACM with line item for "rainscreen lot charge); The letter appears to differentiate the Metro Lakes system from a rain screen system. Doc. 148 at 29–30. Was Riddle involved in the selection of Metro Lakes and the specific ACM product at issue? Absolutely. *See* Doc. 135-1 at 26 ("I suggested the ACM system…"); *but see id.* ("I don't make recommendations…."). Why did Riddle stop showing up for 11 months? Was it because John Davis needed a "breather," or because Scott Riddle was unreliable? The answer depends on who you ask, and it is not the Court's function to make credibility determinations at summary judgment. Relatedly, why did Davis submit the 1st Verification Record on his own? Because Riddle bailed on him or because Davis was hard-headed and thought he could do it on his own? The answer again depends on who you ask.

How about the showroom lighting? Did Riddle make unauthorized changes to the Construction Documents, or did Zingre misunderstand Riddle's email? Again, the answer depends on who you ask, and it is not the Court's function to make credibility determinations at summary judgment. The same holds true for the shop wall paint color. Riddle says he would

never paint it all white; Davis says he told Riddle to paint it how it was supposed to be painted. The jury will decide. Finally, was it reasonable for Davis to profess ignorance of every detail simply because he could throw money at his problems? Unlikely. On the other hand, as a consultant in the business of providing accurate information, Riddle's "I was only here to assist" argument does nothing to absolve him of liability. Defendant's Motion for Summary Judgment is denied as to the breach of contract claim.

**Count 2: Negligent Misrepresentation**

"In Illinois, the elements for negligent misrepresentation are (1) the defendant's duty to communicate accurate information; (2) a false statement of material fact; (3) the defendant's carelessness or negligence in ascertaining the truth or falsity of the statement; (4) the defendant's intent to induce the other party to act; (5) the plaintiff's reliance on the false statement; and (6) the plaintiff's damages resulting from that reliance." *Fremont Fin. Corp. v. IPC/Levy, Inc.*, 994 F. Supp. 988, 990 (N.D. Ill. 1998) (citing *Board of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E. 2d 580, 591 (1989)). As the Court has previously found, Riddle had a duty to communicate accurate information because he was in the business of supplying information for the guidance of others in their business transactions. Doc. 23 at 13; *Fremont Fin. Corp.*, 994 F. Supp. at 991 (citing *Orix Credit Alliance v. Taylor Mach. Works*, 125 F.3d 468, 475 n. 2 (7th Cir. 1997)) ("Illinois courts imply a duty to communicate accurate information in situations involving one who in the course of his business or profession supplies information for the guidance of others in their business transactions.").

Riddle first asserts Davis has failed to establish a false statement of material fact was made by Riddle. Doc. 131 at 36. Specifically, Riddle argues that because Davis stated he had no recollection of any conversations with Riddle concerning ACM or showroom fixtures, Davis

cannot offer any proof that Riddle made false statements or misled him concerning ACM or lighting. *Id*. Riddle's argument ignores Davis' later deposition testimony. Davis later testified in his deposition that Riddle directed the selection of the ACM and the ACM was selected upon Riddle advising him that the ACM would be found complaint and would save him money. Doc. 141-22 at 71. Thus, a dispute of fact remains as to whether Riddle made a false statement of material fact.

Riddle next argues Davis has not shown proof that Riddle was negligent in ascertaining the truth of the alleged statements. Doc. 131 at 36. This argument fails because disputes of fact remain regarding the ACM, such as whether it was a rainscreen system or equivalent. Further, even if the Court takes Riddle's position that he correctly informed Davis based on what he knew at the time, Davis may still argue that, as Davis' consultant, Riddle should have done more to assure the ACM would be approved and should have notified Davis sooner. Additionally, as Davis points out in his Response, disputes of fact remain as to whether Riddle misrepresented that exceptions had been obtained when they had not been. Doc. 141 at 51.

Riddle next argues Davis failed to show evidence that Riddle had an intention to induce Davis to act, claiming that Davis could have followed up with EA or Catalyst. Riddle's argument in this regard in nonsensical, and Davis has produced enough circumstantial evidence of Riddle's intent to allow the jury to answer this question.

Riddle argues Davis cannot establish reliance because he had all the information he needed to make sound decisions from the very beginning—the requirements were all in the DID. Doc. 131 at 37. If that is the case, it begs the question, what was Scott Riddle hired for? Riddle was in the business of providing information and had a duty to communicate accurate

information. Davis was entitled to rely on Riddle's information and apparently did so. Doc. 141 at 52–53.

Finally, Riddle argues Davis cannot establish damages. This issue depends on the underlying disputes of fact identified above. Defendant's Motion for Summary Judgment is denied as to the negligent misrepresentation claim.

**Count 4: Consumer Fraud**

Under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, a plaintiff must show "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the deception occurred in the course of trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury." *Avon Hardware Co. v. Ace Hardware Corp.*, 998 N.E. 2d 1281, 1290 (1st Dist. 2013); *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E. 2d 584, 593 (1996). The Act "does not apply to every breach of contract between two parties, even with the 1990 amendment allowing plaintiffs to recover damages without showing an effect on consumers generally." *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1369 (N.D. Ill. 1996). Thus, "where a plaintiff attempts to allege a violation of the Consumer Fraud Act in a case which appears on its face to involve only a breach of contract, the relevant inquiry is 'whether the alleged conduct ... implicates consumer protection concerns.' " *Id.*, citing *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 654 N.E. 2d 1109, 1116 (2d Dist. 1995).

With respect to the consumer fraud claim, Riddle essentially repackages his earlier arguments: Riddle was not deceptive; Davis was not deceived, based on Davis' deposition testimony; people other than Riddle were responsible for making the relevant decisions; Davis offered no evidence of Riddle's intent. Doc. 131 at 38–41. For the reasons set forth above,

genuine issues of fact preclude summary judgment on this claim. Accordingly, Defendant's Motion for Summary Judgment is denied in its entirety.

## CONCLUSION

For the reasons set forth above, Defendant's Motion (Doc. 131) for Summary Judgment is DENIED. Document 130 is stricken and not considered by the Court.

Signed on this 8th day of July, 2021.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge